This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-38662**

**STATE OF NEW MEXICO ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT,**

Petitioner-Appellee,

v.

**ELISA L.,**

Respondent-Appellant,

**IN THE MATTER OF Z. L.-J., and P. P.,**

Children.

**APPEAL FROM THE DISTRICT COURT OF VALENCIA COUNTY Allen R. Smith, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Susan C. Baker
El Prado, NM

for Appellant

Gail Chasey
Albuquerque, NM

Guardian Ad Litem

**MEMORANDUM OPINION**

**VARGAS, Judge**.

**{1}** Elisa L. (Mother) appeals the district court's termination of her parental rights as to P.P. and Z.L.J. (collectively, Children). Mother argues that the district court erred in finding there was clear and convincing evidence that the New Mexico Children, Youth and Families Department (the Department) made reasonable efforts to assist Mother in addressing the causes and conditions of Mother's neglect of Children. Specifically, Mother contends that the Department's efforts to address the causes and conditions rendering her unable to care for Children were unreasonable because it failed to refer her to an inpatient treatment program. Finding no error by the district court, we affirm.

**BACKGROUND**

**{2}** The Department filed its abuse and neglect petition[1] against Mother after receiving a report that Children were being exposed to frequent domestic violence and substance abuse. In support of its petition, the Department provided an affidavit from a Department investigator, who explained that the reporting party advised that she suspected Mother was abusing alcohol and that domestic violence was taking place in the home in front of Children. The reporting party told the Department investigator that Mother was recently hospitalized after being stabbed by her boyfriend. During a visit to Mother's home, Mother denied daily use of alcohol or recent drug use. However, the investigator found multiple adults living in the home, mattresses on the floor in the bedrooms and the garage, drug paraphernalia, beer cans, and an alcohol shot bottle.

**{3}** The investigator spoke with a case worker at Keeping Families Together, the housing program that placed Mother in the home where she and Children were living. The case worker advised that "no one other than [Mother, grandmother, and C]hildren should be living in the home and anyone else doing so places the family in violation of program rules, which could result in their termination from the program[,]" jeopardizing Mother's housing. The case worker told the investigator that Mother's boyfriend had been arrested for domestic violence at Mother's residence a month earlier, that she was concerned for the safety of Children, and that she suspected drug use in the home.

**{4}** The investigator also interviewed Mother's oldest child, P.P., who reported that Mother's boyfriend (youngest child's father) was mean to his mom and "breaks stuff," including "break[ing] his toys intentionally by stepping on them, kicking them, and throwing them," and "breaking [some] glass that was a part of their home" during a fight with Mother. P.P. also told the investigator that when Mother and her boyfriend fight, his grandmother "takes [Children] upstairs and locks them in the bathroom to keep them safe [and] if grandma is not home during a fight he gets [his brother] and runs upstairs to hide, so they are safe." P.P. also reported to the investigator that on occasion, they

---

1Other respondents are named in the petition but are not mentioned herein as they are not relevant to nor part of Mother's appeal.

did not have enough food in the house and that Mother would sometimes lock him in his room without food when he was in trouble.

**{5}** When the investigator visited P.P.'s school, the investigator found he was frequently truant, and when he did attend, he would not interact with others. P.P.'s teacher reported that on some occasions, he came to school smelling strongly of smoke and, on a few instances, wore the same clothes a few days in a row. When the school provided P.P. with a change of clothes, he was hesitant to change into the new clothes and wore long sleeves and pants, as he did not want any of his body showing. Mother would not communicate with P.P.'s teacher to address the issues P.P. was having at school.

**{6}** The affidavit accompanying the petition also noted the Department had received three prior referrals relating to Mother and Children. These reports likewise concerned Mother's substance abuse and incidents of domestic violence. The reports memorialized multiple attempts by the Department to assist Mother and prevent removal of Children, including referrals to services for intensive alcohol abuse outpatient treatment, parenting, counseling, domestic violence services, and random drug screens. The Department also made several unsuccessful attempts to implement safety plans by using Children's maternal grandmother as a safety monitor.

**{7}** The district court entered an *ex parte* custody order granting custody of Children to the Department on November 3, 2016, and ultimately placed Children with their maternal grandfather and his significant other. At the adjudication hearing, Mother entered a plea of no contest to the charges of child neglect under NMSA 1978, Section 32A-4-2(G)(2) (2016, amended 2018) (formerly NMSA 1978, Section 32A-4-2-(F)(2) (2016)). The district court found, and Mother did not dispute, that domestic violence, substance abuse, a lack of safe and stable housing and parenting skills, and inadequately diagnosed and/or treated mental health concerns had impaired her ability to care for Children. Children were adjudicated as neglected by Mother on February 27, 2017, and a stipulated judgment was filed on March 2, 2017.

**{8}** Fourteen months after stipulating to her neglect of Children, the Department moved to terminate Mother's parental rights. A termination of parental rights (TPR) hearing was held seven months later, after which the district court concluded that Mother neglected Children, the Department proved by clear and convincing evidence that it had made reasonable efforts to assist Mother in addressing the causes and conditions of neglect, the conditions and causes of neglect will not change in the foreseeable future, and Mother's parental rights should be terminated. Mother appeals.

## DISCUSSION

**{9}** On appeal Mother's challenge is limited to her claim that the district court erred in finding that reasonable efforts were made by the Department to assist her in alleviating the causes and conditions that brought Children into the Department's custody. We

conclude that, under the totality of the circumstances, substantial evidence supports the district court's finding that the Department's efforts were reasonable.

## I.      Standard of Review

**{10}**    When considering the termination of parental rights, the district court is obligated to "give primary consideration to the physical, mental and emotional welfare and needs" of the children. NMSA 1978, § 32A-4-28(A) (2005). Section 32A-4-28(B)(2) of the Abuse and Neglect Act (ANA) provides that the district court shall terminate parental rights if:

> [T]he child has been a neglected or abused child as defined in the [ANA] and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by the [D]epartment . . . to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

It is the Department's burden to demonstrate that these elements are met by clear and convincing evidence. *State ex rel. Children, Youth & Families Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 31, 370 P.3d 782; *see* § 32A-4-28(B)(2). "Clear and convincing evidence means evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *Nathan H.*, 2016-NMCA-043, ¶ 31 (internal quotation marks and citation omitted); *State ex rel. Children, Youth & Families Dep't v. David F., Sr.*, 1996-NMCA-018, ¶ 34, 121 N.M. 341, 911 P.2d 235 (defining clear and convincing evidence as "proof stronger than a mere preponderance and yet something less than beyond a reasonable doubt" (internal quotation marks and citation omitted)). We uphold the district court's termination decision "if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). We give deference to the district court's findings of fact, *State ex rel. Children, Youth & Families Dep't v. Brandy S.*, 2007-NMCA-135, ¶ 17, 142 N.M. 705, 168 P.3d 1129, and are mindful that "[w]e cannot reweigh the evidence. Conflicts in testimony are matters for the trial court to resolve." *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 28, 128 N.M. 701, 997 P.2d 833.

## II.      The Department's Efforts to Address the Causes and Conditions of Mother's Neglect Were Reasonable

**{11}**    Mother contends that we must reverse the decision of the district court because the Department failed to make reasonable efforts to assist her in addressing the causes and conditions that brought Children into the Department's custody when it failed to refer her in an inpatient treatment program to address her substance abuse issues. The Department, she asserts, set "unrealistic goals that [Mother] could never meet especially given her homelessness and lack of transportation." An inpatient treatment program, Mother claims, would have remedied her substance abuse and homelessness

issues, as well as her challenges with transportation to appointments and mandatory drug testing.

**{12}**    The Department has a statutory duty to create a treatment plan that "provide[s] reasonable efforts to assist the parent to change the conditions that gave rise to the neglect." *State ex rel. Children, Youth & Families Dep't v. Athena H.*, 2006-NMCA-113, ¶ 9, 140 N.M. 390, 142 P.3d 978; *see* § 32A-4-28. "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *State v. ex rel. Children, Youth & Famlies Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 23, 132 N.M. 299, 47 P.3d 859. Reasonable efforts may include providing "parenting classes, individual family counseling, substance abuse counseling, and therapeutic visits between [the parent] and the children." *Hector C.*, 2008-NMCA-079, ¶ 26. "Both the Department and [the parent] are responsible for making efforts toward reunification of the family." *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 48, 421 P.3d 814. "[O]ur job is not to determine whether [the Department] did everything possible; our task is limited by our statutory scope of review to whether [the Department] complied with the minimum required by law." *Patricia H.*, 2002-NMCA-061, ¶ 28. In reviewing the Department's efforts on appeal, we consider the totality of the circumstances, *see id.* ¶ 31, and "avoid reweighing individual factors in isolation." *State v. Martinez*, 2018-NMSC-007, ¶ 12, 410 P.3d 186.

**{13}**    In the stipulated judgment and disposition adjudicating Children neglected, the district court adopted the treatment plan proposed by the Department. The treatment plan addressed the causes and conditions of Mother's abuse and neglect by referring Mother for domestic violence, psychosocial, substance abuse, parenting, and mental health assessments, as well as a psychological evaluation, and requiring her to follow any recommendations of the professionals who performed those assessments. The treatment plan also required the Department to arrange for random urinalysis (UA) tests for Mother, to arrange for visitation with Children, to obtain signed releases of information from Mother, to identify relatives for placement of Children, to monitor Mother's home life to confirm she had obtained safe and stable housing, and to schedule regular appointments for Mother with the Department. Mother's obligations under the treatment plan were to maintain contact with the Department, obtain safe and stable housing, participate in assessments and follow the resulting recommendations, participate in visitation with Children, sign releases, and help the Department to identify placement options for Children. Debra Linford, the permanency planning worker who worked on the case, testified that she reviewed each component of the treatment plan with Mother and provided her with a copy.

## A.    Evidence Presented at the TPR Hearing

**{14}**    At the TPR hearing, Mother testified that she had been homeless and unemployed for approximately two years preceding the hearing. Mother claims that an inpatient treatment program was necessary to allow her to successfully complete the requirements of her treatment plan. We initially note that the Department is not required

to craft its case plans around conditions unilaterally imposed by the parent. *See Patricia H.*, 2002-NMCA-061, ¶ 27. We therefore consider the actions taken by the Department to determine whether they were reasonable.

**{15}** At the TPR hearing, Ms. Linford testified that she referred Mother to Besito Mental Healthcare to assess her issues with domestic violence and required Mother to follow any recommendations they made. Deanna Osborne, a therapist from Besito testified that Mother contacted Besito and scheduled an assessment for February 23, 2017. On that day, Mother arrived late to her appointment, so the assessment was not completed. Mother eventually returned and completed the assessment and was diagnosed with generalized anxiety disorder, Post Traumatic Stress Disorder (PTSD), amphetamine and alcohol abuse, and persistent depression disorder with dysthymia. Besito recommended that she participate in several different group therapies, including healthy relationship, and seeking safety and serenity groups to address her domestic violence issues, as well as parenting, and maintaining sobriety groups to address those issues. Ms. Osborne explained, however, that Mother never engaged in any of the group therapies or services recommended by Besito, and she was eventually discharged from its program.

**{16}** Ms. Linford testified that she also provided Mother with a referral to Valle del Sol of New Mexico to perform domestic violence, substance abuse, parenting, and mental health assessments. In addition to performing these assessments, Valle del Sol was able to provide individual and family counseling, as well as group and individual substance abuse counseling. Mother, however, never did an assessment at Valle del Sol, despite Ms. Linford's offer to provide train passes to assist Mother with transportation.

**{17}** Ms. Linford explained that she coordinated with Valencia Shelter Services to secure Mother a bed at Turquoise Lodge. Mother, however, left the same day she was transported there. She told Ms. Lindford that she left because she had a visit with Children the following day and was not sure she would be able to see them, as Turquoise Lodge has a blackout period where clients are not allowed outside contact.

**{18}** We note that Mother erroneously complains that to address her substance abuse issues, the treatment plan merely called for a substance abuse assessment, which she argues was insufficient. The court-ordered treatment plan, however, clearly called for Mother to complete a substance abuse assessment *and follow through with recommendations*, which, according to Ms. Osborne, Mother failed to do.

**{19}** The Department also referred Mother to Dr. Clifford Morgan on January 24, 2017, for a psychological evaluation; however Mother did not attend and never rescheduled the appointment. Mother contends that her visit to Mesilla Valley Hospital, where she apparently received a psychiatric evaluation, satisfied the requirement for a psychological assessment, so another assessment was unnecessary. Mother explained that she checked herself into Mesilla Valley Hospital for two weeks to address a mental health crisis. However, Ms. Linford responded that she was unaware of Mother's stay at

Mesilla Valley Hospital until after Mother had already left, and that the *psychiatric* evaluation Mother had done was not accessible to the Department because Ms. Linford only had a release of information for a *psychological* evaluation. Ms. Linford testified that she explained this to Mother, but Mother refused to sign a new release.

**{20}** In addition to the referrals made by the Department, the testimony presented at the TPR hearing revealed that Mother sought out several programs and services on her own, but did not complete them, including multiple inpatient treatment programs of the type she claims the Department should have referred her to. Mother sought inpatient treatment with Casa de Phoenix (part of St. Martin's), Hope Ministry in Denver, Colorado, and Steelbridge Ministries, in addition to her stay at Mesilla Valley Hospital.

**{21}** Roxanne Garcia, the vice-president of women's programs at Steelbridge Ministries testified that she interviewed Mother and offered her a position in a twelve-month inpatient treatment program where she would live at the facility and attend full-time classes and weekly counseling for matters related to substance abuse, relapse prevention, behavioral therapy, processing and mindfulness, and trauma, all at no-cost to Mother. Mother declined to participate, citing her obligation to attend hearings in these proceedings and visitation with Children. However, Ms. Garcia testified that Steelbridge Ministries would have permitted visitation at its facility and would have allowed Mother to attend documented hearings. Mother was then offered classes and counseling at Steelbridge Ministries on an outpatient basis, but those services were withdrawn after two and one-half weeks because Mother failed to attend most of the scheduled classes.

**{22}** Mother testified that she began a one-year inpatient treatment program at Hope Ministry in Denver, Colorado, but left after two weeks so that she could attend visits with Children. Mother checked into a program at Casa de Phoenix, but left sometime between three days to two weeks later because of a dispute with her roommate.

**{23}** Mother told Ms. Lindford that she did not follow through with the services offered by Besito because she planned to go to an inpatient treatment program at Turquoise Lodge; but on the occasion she was transported there, she left the same day. Mother also admitted that while she had put herself on a waiting list to attend inpatient treatment at Turquoise Lodge on several occasions, she changed her phone number and did not provide it to Turquoise Lodge, preventing Turquoise Lodge from contacting her. Mother also checked herself into Mesilla Valley Hospital for two weeks to get mentally stable; however, Mother's stay at Mesilla Valley Hospital only addressed Mother's mental health issues and did not address her substance abuse or other issues.

**{24}** In addition to the inpatient treatment programs Mother contacted, Mother testified that she also sought out treatment through MATS detox center, addiction meetings at the Isleta Club, and counseling at Duke City Recovery. However, the district court noted it had nothing aside from Mother's testimony to confirm these efforts. The district court found that, despite all of Mother's attempts at inpatient treatment, it was concerning

that, with the exception of a detox stay, Mother had not demonstrated "completion of any programs, none."

**{25}**   Mother also contends that she was not able to comply with the UA requirement because the UAs were administered in Los Lunas and Mother was homeless, living in Albuquerque. Mother was to begin submitting UAs in November 2016. In the two years that followed, Mother only submitted one UA. She testified that she requested permission to do UAs in Albuquerque, but that Ms. Linford rejected her request and required her to submit to UAs in Los Lunas. Ms. Linford, however, disagreed with Mother's testimony and testified that she offered Mother the opportunity to do her UAs in Albuquerque while the Department had a service-provider there, giving Mother written documentation of the hours of service and address of the service-provider. When that service-provider was no longer available, Ms. Linford explained that UAs were available to Mother at Quest Diagnostic, which was located about a fifteen-minute walk from the location where she visited Children in Los Lunas. Mother complained that UAs in Los Lunas were inconvenient and she would not have sufficient time to get from the train station to the UA site and then to visitation.

**{26}**   Of particular concern was Ms. Linford's testimony that she had a difficult time keeping track of what Mother was doing and where she was. Ms. Linford explained that she would usually find out about the programs Mother was involved with after she had already been there and left. Mother only sometimes had a phone, and the most reliable way to make contact with her was for Ms. Linford to go to Mother's scheduled visits with Children.

## B.   Totality of the Circumstances

**{27}**   Taking into account the totality of the circumstances, we conclude that substantial evidence of a clear and convincing nature was presented that the Department made reasonable efforts to assist Mother to alleviate the issues that brought Children into the Department's custody. *See Athena H.*, 2006-NMCA-113, ¶ 9 (requiring the department to make reasonable efforts).

**{28}**   In this instance, the Department referred Mother to Besito and Valle del Sol to assess and treat her issues with domestic violence, substance abuse, parenting, and mental health. It also coordinated with other providers to obtain a bed for Mother at the inpatient program at Turquoise Lodge. The Department arranged for a psychological evaluation with Dr. Clifford, and for UAs for Mother in Albuquerque for a period of time, and then in Los Lunas.

**{29}**   The Department attempted to stay in regular contact with Mother and tried to monitor her housing situation. However, the Department had a difficult time communicating with Mother because either Mother was not where she said she would be, or the Department just did not know where Mother was, frustrating the Department's efforts to address Mother's housing instability. *Cf. State ex rel. Children Youth & Families Dep't v. Benjamin O.*, 2009-NMCA-039, ¶ 37, 146 N.M. 60, 206 P.3d 171

(rejecting the father's claim that the department's efforts to assist him with housing were unreasonable when the father would not provide an address of his residences, precluding the department from making the necessary home visit).

**{30}** While Mother claims that the Department's failure to refer her to an inpatient treatment program rendered it impossible for her to satisfy the terms of the treatment plan, the evidence presented at the TPR hearing indicates that Mother was either unable or unwilling to complete any of those programs, whether inpatient or outpatient, despite opportunities to attend both types of programs. We cannot agree with Mother that the Department has failed in its efforts when she has taken little to no action to comply with the treatment plan and has failed to complete any of the inpatient programs she claims the Department should have referred her to. *See Patricia H.*, 2002-NMCA-061, ¶ 31 (holding that the parent's level of cooperation and recalcitrance of the problems that render parent unable to provide adequate parenting bear on the reasonableness of the department's efforts); *Keon H.*, 2018-NMSC-033, ¶ 48 (holding that the parent, along with the department, is responsible for making efforts toward reunification). While we express our concerns about requiring Mother to travel to Los Lunas to submit to UAs while she was living in Albuquerque, under the totality of the circumstances, we cannot conclude that the requirement rendered the Department's overall efforts unreasonable, especially in light of Mother's failure to take advantage of the opportunity to submit to the UAs in Albuquerque while they were available there.

**{31}** Mother failed to participate in any recommended services, did not maintain consistent contact with the Department, only submitted one UA, did not complete a psychological evaluation, and never completed any of her self-referred inpatient treatment programs. Mother's lack of cooperation with the Department's treatment plan for nearly two years supports that reasonable efforts were made by the Department. *See State ex rel. Children, Youth & Families Dep't v. Tammy S.*, 1999-NMCA-009, ¶ 15, 126 N.M. 664, 974 P.2d 158 (holding that the "[f]ather's transience, failure to communicate, and lack of cooperation rendered the [d]epartment's efforts sufficient"); *see also Patricia H.*, 2002-NMCA-061, ¶¶ 23, 31 (explaining that the "level of cooperation" by the parent factors into the reasonableness of the department's efforts); *Vanessa C.*, 2000-NMCA-025, ¶ 29 (reasoning that under the totality of the circumstances the district court properly found that the evidentiary standard for termination was met when there was "two years with limited or no long-term or sustained progress being made").

## III.     Conclusion

**{32}** We affirm.

**{33}    IT IS SO ORDERED.**

**JULIE J. VARGAS, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**SHAMMARA H. HENDERSON, Judge**